S. E. DUNHAM, d/b/a Independent Lumber Company, Plaintiff in Error,

v.

Nancy JACKSON, Defendant in Error.

No. 38584.

Supreme Court of Oklahoma.

Feb. 16, 1960.

738

Frank Settle, Tulsa, for plaintiff in error.

A. A. Berringer, Tulsa, for defendant in error.

JOHNSON, Justice.

Nancy Jackson brought this action in the Common Pleas Court of Tulsa County, Oklahoma against S. E. Dunham, d/b/a Independent Lumber Co., Jarrett Milam and First Bancredit Corporation, a corporation, to recover damages for breach of contract. Plaintiff dismissed her action against Bancredit Corporation with prejudice, leaving the issues as between the plaintiff and the remaining two defendants.

The case was tried to a jury which returned a verdict in favor of plaintiff against S. E. Dunham, d/b/a Independent Lumber Company, for $3,000 and a separate verdict in favor of the defendant Jarrett Milam. Defendant Dunham, after denial of his motion for a new trial, appealed to this court.

Dunham's assignments of error may be briefly stated under three categories. First, was the verdict and judgment sustained by the evidence? Second, did the trial court err in allowing the jury to view the property, the subject matter of the action? Third, was the contractor alone responsible to the contractee for the proper performance of the contract?

Plaintiff contends that these questions should be answered in the affirmative, while the defendant Dunham argues to the contrary. The answer to these contentions involves and presents questions of both fact and law.

In this connection Dunham contends that the trial court should have sustained his demurrer to the evidence, motion for a directed verdict and motion for a new trial.

██ We have consistently followed the rule stated in Fleming v. Hodgson, 199 Okl. 261, 185 P.2d 181, 182, as will be seen by an examination of that case, and others of similar import. See 14 Okl.Dig.Trial ██ 178.

In the syllabus in Fleming v. Hodgson, supra, the rule was stated thusly:

"In passing upon a demurrer to the evidence or a motion for a directed verdict, the trial court should consider as true all the evidence favorable to the party against whom the demurrer or motion is directed, together with all inferences reasonably to be drawn therefrom, and should disregard all conflicting evidence favorable to the demurrant or movant.

"In trials by jury, it is only where the facts, although undisputed, are such that all reasonable men must draw the same conclusion from them that the court is authorized to direct a verdict."

Applying this rule to the pleadings and facts in the case at bar, we find no error.

██ However, Dunham places emphasis upon and principally relies upon his motion for a new trial and predicates his argument upon the proposition that the ver-

dict was not supported by the evidence. Again we are confronted with another one of our well established rules stated in the body of the opinion in Bates v. Winkle, 208 Okl. 199, 254 P.2d 361, 364, which is as follows:

"The granting or denial of a motion for new trial is addressed to the sound legal discretion of the trial court, and the trial court's action will not be disturbed on appeal unless it clearly appears the court erred in some pure, simple and unmixed question of law, or acted arbitrarily or capriciously. Williams v. Long Bell Lumber Co., 203 Okl. 250; 219 P.2d 992. Moreover, we often have pointed out that the 'discretion of the trial court' means a legal discretion which is to be exercised in discovering the course prescribed by recognized principles of law. Petite v. Davis, 203 Okl. 547, 223 P.2d 1082. * * *"

The determination of whether the verdict and judgment is sustained by the evidence requires a review of the evidence adduced in the case.

■ The alleged breach of the contract in question was the failure of the contractor to do the work in a "workmanlike manner." Therefore, it was incumbent upon plaintiff to prove, first, that defendant Dunham was the contractor; second, that the work was not done in a "workmanlike manner" and, third, the amount of damages sustained by plaintiff.

Plaintiff testified that the defendant Dunham called her in the first part of August, 1957, and told her that he had learned that she wanted some work done; that they engaged in conversation relative to the work she desired to have done, and he asked her what she wanted done; that she explained to him, and he told her that he would send some one out to talk to her; that he sent Mr. Milam to her place to talk to her about the matter, and she told Mr. Milam she wanted two rooms built on the south side of the house, repair the rest of the house, build new porch on back and a stoop in front, doorbells, connect gas and electricity, put foundation under whole structure and paint inside and out; that Mr. Milam said it would take about $2,400 to do the job, and that she told Mr. Dunham he could do the work for $2,450. That thereafter defendant Dunham contacted her and told her to come to his office and bring a cosigner, which she did on or about August 25, 1957. She testified further that on that date, which was the only time she was ever in his office and the only time she signed any papers that she signed two papers which she did not read because she could not have read and understood them, but understood from her conversation with defendant Dunham that they were application papers for a loan. About two or three weeks thereafter Mr. Milam came out and commenced the work. On or about October 17 or 18, plaintiff moved into the house although it was not completed, and still was not finished on the day of the trial. She further testified that she called defendant Dunham and told him that the roof was leaking, causing damage to the ceiling, furniture, clothing, etc. but still he did nothing; that the water ruined clothes valued at $150, a rug and pad valued at $150 and a mattress valued at $39.50.

Plaintiff introduced exhibits in evidence to corroborate her testimony that defendant Dunham, d/b/a Independent Lumber Company, was the contractor; that is to say Exhibit 1, which was a credit application showing Independent Lumber Company as contractor and signed by S. E. Dunham under "I certify that I am the person who sold this job." Exhibit 2, which was an outline of proposed improvements, written on Independent Lumber Company stationery and signed Independent Lumber Company by S. E. Dunham. Exhibit 3 was a note to Independent Lumber Company (dealer or contractor) and endorsed Independent Lumber Company (dealer or contractor) by S. E. Dunham. Exhibit 4 was a notice to plaintiff from First Bancredit Company showing Independent Lumber Company as dealer. Exhibit 5 was a completion of work certificate signed In-

dependent Lumber Company by S. E. Dunham. Exhibit 6 was a check in the amount of $2,450 (total price for labor and material on plaintiff's property) payable to Independent Lumber Co. and endorsed by Independent Lumber Company. Also First Bancredit Co. voucher showing $2,450 paid to Independent Lumber Company. Exhibit 7 was an application for building permit showing Nancy Jackson as owner and Independent Lumber Co. as contractor. Exhibit 8 was an application for building permit of Nancy Jackson as owner and Independent Lumber Company as contractor; in that respect also a duplication of number 7. Exhibit 9 was a building permit which aslo showed Nancy Jackson as owner and Independent Lumber Company as contractor.

The plaintiff introduced testimony of two building contractors, Charles M. Stout and H. P. Carnagey, to prove that work was not done in a "workmanlike manner" and the amount of damages sustained.

Charles M. Stout testified that he had been a building contractor for 7½ years doing both repair and new construction, most of which was on the south side of Tulsa and was presently building a two-bedroom addition to a house in Bolewood Acres for approximately $6,000. That he had inspected the work done on plaintiff's premises, and that it was as bad a job as he had ever seen. He described the work in detail as follows: Outside siding-boards were used rotten, full of holes, and were not fit to be painted; that windows were not acceptable to any one for anything and were old and rotten with no window weights to counterbalance them; that there were no window stops to keep windows from falling out when raised and no weatherstripping; that screens were not acceptable to any one and were not made for the windows and were nailed in place with one or two nails instead of being hung by hinges at top; that the new portion of the roof was mostly blown off, no felt base, and one nail to the shingle and about four inches drop from old roof to new roof; that siding and eaves joint were butted instead of staggered; that it looked like the new portion just pushed up against old portion instead of building on it to make it look like a part of the original construction. He testified further that he did not find one window jamb nor one door that fit; that he could stick his finger through the opening at the top of the door between the bedrooms; that the door from the living room to the bedroom was replaced with a door five or six inches shorter, leaving an opening in the living room wall above the door jamb which was never covered; that the doors were not painted; that the floors were single construction pine with no subflooring or felt on 2 x 6 floor joints 24" apart, with no underpinning; that they were not solid and by jiggling on floors could bounce vases off shelf; that the paint was too thin to cover in bedrooms; that they started out using a blue paint in back bedroom, then finished it in a different color; that part of baseboard in living room was painted and part was left unpainted; that there was a hole 12 to 15 inches in diameter where plumbing came through wall, and hole where light fixture in ceiling had been moved was never covered; that sheetrock was completely ruined throughout the house from leaking roof, and the front stoop had no roof; that blocks were stuck together for steps with no handrail, and footing was inadequate, and new portion was settling and cracking.

Mr. Stout further testified that $2,450 would have been a reasonable price for the job using new material and done in a "workmanlike manner," and that he would charge at least $2,000 to place the property in the condition it would have been had the work been done in a "workmanlike manner" due to the additional labor of tearing out defendant's work.

Mr. H. P. Carnagey testified that he had been a carpenter for twelve years and operated under the name Reliable Carpenter Service; that he did rough trim, finish work and cabinets, and that he contracted mostly repair work and additions to old or new homes; that he viewed these premises in July of 1957 and gave an estimate of

$2,717.48 for labor and material for the following work: an addition 14′ x 32′ which was two bedrooms and a bath, full back porch and remodeling the interior of the house; that the addition subsequently built on by defendants was only 10′ x 22′ with no new bathroom and a small back porch; that his bid for said smaller addition, excluding plumbing, wiring and decorating, would have been $1,200 to $1,500 less; and that he could have done the work performed by defendants in a "workmanlike manner," using all new material, for $2,450 and realized a reasonable profit. His description of the various defects of defendant's work was substantially the same as Mr. Stout's, plus two additional statements: "Well, it doesn't look like a carpenter did the work," and "I did not see anything in the house that fit." He also testified that a rough figure on what it would cost to place the property in the condition it should have been had it been done in a "workmanlike manner" was $2,000 to $3,000; that to place it in that condition he would have to tear the whole thing out and put it back right; that he made an estimate not to put it in the original condition it should have been, but to repair that that exists now for $1,550, and that in his opinion none of the work was done in a "workmanlike manner."

We are of the opinion that the testimony of these witnesses, together with Exhibits 1 to 9 inclusive, was sufficient to warrant the jury in finding that defendant Dunham was the contractor; that the work was not done in a workmanlike manner, and that she suffered damages as a result thereof.

The defendants' evidence was simply a denial, by themselves of plaintiff's evidence. Defendant Dunham denied that he was the contractor, and said he simply handled the loan for plaintiff; yet every written instrument in this transaction shows Independent Lumber Company as contractor or dealer and is signed by defendant Dunham, even on the written memo of the work to be done and the completion certificate. Jarrett ·Milan's name was conspicuously absent from the whole transaction.

The defense put on testimony of B. K. Boone, R. L. Boyd and Ernest B. Womack to show that defendant Milam hired and paid them by check, but it is significant that they made no attempt to introduce the cancelled checks to show who actually paid them. On cross-examination R. L. Boyd testified that defendant Milam paid him by check, but when asked who the check was drawn on, he stated he did not know. Then on re-direct examination, counsel for defendants had the reporter mark a check defendant's Exhibit 5, had Mr. Boyd identify it as the check he received for his electrical work, but did not offer it in evidence. The only plausible explanation for not introducing said check in evidence is that it would have shown that defendant Dunham, not defendant Milam, paid Mr. Boyd. Also, defendant Dunham testified that First Bancredit wrote him a check for $2,450, and that he saw that all labor and subcontractors were paid, which is the usual procedure of a general contractor. Next, defendant Dunham was asked if he had cancelled checks showing payments of every one, and he said "No, but I can get them," and agreed to bring them to court the next day, but when he took the stand the next morning he said he could not find them.

Defendant Dunham offered no proof whatsoever, except his testimony that he was not the contractor, and we note in examining the record that defendant Milam was never asked, nor did he ever testify directly, that he was the general contractor and only brought material from defendant Dunham. The closest defendant Milam got to that point was when he said:

"Q. Mr. Milam, in August of 1957, did you have some transaction with the plaintiff Nancy Jackson? A. Yes.

"Q. What was your occupation then? A. Independent contractor.

"On rebuttal plaintiff was asked:

"Q. Nancy, I ask you specifically who you contracted with to do this work and who you relied on to see that

it was performed properly. A. I looked to Dunham."

To refute plaintiff's evidence that the work was not done in a "workmanlike manner," defendant Milam and Ernest B. Womack testified that they did the work and did it in a "workmanlike manner." The defendants did not produce a disinterested, qualified building and repair contractor to state that said work was done in a "workmanlike manner." The jury and every one else who viewed the premises could readily see whether plaintiff's witnesses, Stout and Carnagey, truthfully described the premises.

 The defendants offered no evidence of any kind to refute plaintiff's evidence of damages, so the evidence as to the amount of damages must stand as true.

From this resume of the testimony we find that there was sufficient evidence for the jury to determine that Dunham was the contractor and that the work was not done in a "workmanlike manner," resulting in the amount of the damages recovered in the verdict and judgment.

We next consider defendant's complaint about the court's order directing the jury to view the property.

Under 12 O.S.1951 § 579, it is provided:

"Whenever, in the opinion of the court, it is proper for the jury to have a view of the property which is the subject of litigation, or of the place in which any material fact occurred, it may order, them to be conducted, in a body, under the charge of an officer, to the place, which shall be shown to them by some person appointed by the court for that purpose. While the jury are thus absent, no person, other than the person so appointed, shall speak to them on any subject connected with the trial."

An examination of the record on this issue confirms the plaintiff's contention that the court's action in the matter was not an abuse of discretion. 12 O.S.1951 § 579, supra.

In construing the above statute following our holding in many other cases, we said that permitting a jury to view property which is the subject of the action is within the discretion of the trial judge, and the trial court's ruling will not be reversed in the absence of a showing of abuse of discretion. Cities Service Oil Co. v. Merritt, Okl., 332 P.2d 677.

The third question posed is answered in the affirmative. In so far as plaintiff's right to recovery is concerned as appears in this action, Dunham, the contractor, alone is responsible to her as contractee.

Under the facts and circumstances of this case we must apply the long established rule that in an action of legal cognizance, tried to a jury, this court will affirm a jury verdict and judgment based thereon if there is any evidence reasonably tending to sustain same. We therefore hold that the verdict and judgment was so sustained.

Affirmed.